**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

CHRISTINA C. SEIDNER, JARED MACKRORY,
Individually, and as representatives of a Class of
Participants and Beneficiaries of the Kimberly-Clark
Corporation 401(k) & Profit Sharing Plan,

      Plaintiffs,

    v.

KIMBERLY-CLARK CORPORATION,

    and

BOARD OF DIRECTORS OF
KIMBERLY-CLARK CORPORATION,

    and

BENEFITS ADMINISTRATION COMMITTEE
OF KIMBERLY-CLARK CORPORATION,

    and

JOHN DOES 1-30

    Defendants.

CASE NO.  3:21-cv-867

**CLASS ACTION COMPLAINT**
**FOR CLAIMS UNDER**
**29 U.S.C. § 1132(a)(2)**

<u>**COMPLAINT**</u>

COMES NOW Plaintiffs, Christina C. Seidner and Jared Mackrory, individually and as

representatives of a Class of Participants and Beneficiaries on behalf of the Kimberly Clark

Corporation 401(k) and Profit Sharing Plan (the "Plan"), by their counsel, WALCHESKE & LUZI,

LLC and KENDALL LAW GROUP, PLLC,  and for a claim against Defendants, alleges and asserts

to the best of their knowledge, information and belief, formed after an inquiry reasonable under the

circumstances, the following:

1

## INTRODUCTION

1.      The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.      The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting service providers and investments *as well as* a continuing duty to monitor fees and expenses of selected service providers and investments and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"). It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan." *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.
>
> *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.      Defendants, Kimberly-Clark Corporation ("Kimberly Clark"), the Board of Directors of the Kimberly-Clark Corporation ("Board Defendants"), the Benefits Administration Committee of the Kimberly Clark Corporation ("Committee Defendants"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercises discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the Kimberly-Clark Corporation 401(k) and Profit Sharing Plan ("The Plan") – that it sponsors and provides to its employees.

4.      Plaintiffs allege that during the putative Class Period (April 15, 2015 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29

U.S.C. §1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other Participants of the Plan by authorizing the Plan to pay unreasonably high fees for retirement plan services ("RPS").

5.      These objectively unreasonable RPS fees cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiffs, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for RPS.

6.      To remedy, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

8.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.      Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391

because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10.     In conformity with 29 U.S.C. §1132(h), Plaintiffs served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11.     Plaintiff, Christina Seidner, is a resident of the State of Wisconsin and currently resides in Appleton, Wisconsin, and during the Class Period, is a Participant in the Plan under 29 U.S.C. § 1002(7).

12.     Plaintiff Seidner worked  as a Senior Brand Manager.  She was hired April 9, 2013, and worked at the Kimberly-Clark facility in Neenah, Wisconsin.

13.     Plaintiff's employment with Kimberly-Clark ended on March 30, 2021.

14.     Plaintiff, Jared Mackrory, is a resident of the State of Colorado and currently resides in Broomfield, Colorado, and during the Class Period, is a Participant in the Plan under 29 U.S.C. § 1002(7).

15.     Plaintiff Mackrory worked as a Director of Shopping Marketing.  He was hired July 12, 2010, and worked at the Kimberly-Clark facility in Neenah, Wisconsin.

16.     Plaintiff's employment with Kimberly-Clark ended on June 19, 2019.

17.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts in which they are still Participants, those injuries are fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

18.     It is well settled, moreover, that recovery may be had for the Class Period before Plaintiffs personally suffered injury, as that turns on ERISA §502(a)(2) on which their claim rests.

4

This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA § 409 protect the entire Plan. Courts have recognized that plaintiffs with Article III standing, like Plaintiffs, may proceed under ERISA §502(a)(2) on behalf of the Plan and all Participants in the Plan. Plaintiffs may seek relief under ERISA §502(a)(2) that sweeps beyond their own injury and beyond any given investment they have held as Participants in the Plan.

19.     The named Plaintiffs and all Participants in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable fee decisions made with regard to the Plan.

20.     The named Plaintiffs and all Participants in the Plan did not have knowledge of all material facts (including, among other things, the RPS fees and total cost comparisons to similarly-sized Plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

21.     The named Plaintiffs and all Participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Plans. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting and monitoring the Plan's Retirement Plan Service Providers ("RPSP") because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth below.

22.     Kimberly-Clark Corporation is a company with its principal headquarters located at 351 Phelps Drive, Irving, TX 75038-6507. In this Complaint, "Kimberly-Clark" refers to the

named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

23.     Kimberly-Clark sells products, including Adult Care, Baby and Child Care, Family Care, and Feminine Care products. Brands include Depend, Huggies, Kleenex, Cottonelle, Scott, and Kotex.

24.     Kimberly-Clark acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and scope of their business. Kimberly-Clark appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Kimberly-Clark, and its Board, are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

25.     The Benefits Administration Committee of the Kimberly Clark Corporation ("Committee Defendants") is the Plan Administrator of the Kimberly-Clark Corporation 401(k) and Profit Sharing Plan and located at P.O. Box 59051, Knoxville, TN 37950-9051.

26.     As the Plan Administrator, the Benefits Administration Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The  Benefits Administration Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

27.     The Benefits Administration Committee, as well as individuals who carry out Plan functions (John Does 11-20), are collectively referred to herein as the "Committee Defendants."

28.     To the extent that there are additional officers and employees of Kimberly-Clark who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Kimberly-Clark officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

29.     The Plan is a "defined contribution" pension Plan under 29 U.S.C. §1102(2)(A) and 1002(34), meaning that Kimberly-Clark's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the participants.

30.     The Plan currently has about $4,000,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

31.     With 16,792 participants in the year 2019, the Plan had more participants than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $3,994,082,000 in assets in the year 2019, the Plan had more assets than

99.96% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

### ERISA'S FIDUCIARY STANDARDS

32.     ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. §1104(a)(1) provides in relevant part:

[A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the Plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

33.     With certain exceptions, 29 U.S.C. §1103(c)(1) provides in relevant part:

[T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

34.     29 U.S.C. §1109 provides in relevant part:

Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

35.     Under ERISA, fiduciaries that exercise any authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of third parties including service providers to the Plan such as retirement plan service providers and those who provide investment

products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan").

36.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody,* 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan Participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. §2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution Plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

37.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act §7.

38.     29 U.S.C. §1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. §1109.

## DEFINED CONTRIBUTION INDUSTRY

39.     Over the past three decades, defined contribution plans have become the most

common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in a plan are referred to as "Participants."

**Retirement Plan Services**

40.     Defined Contribution plan fiduciaries virtually always hire service providers to deliver a retirement plan benefit to their employees. There is a large group of national retirement plan services providers ("RPSP"), commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of virtually all retirement plans. In some cases, these RPSP have developed all the capabilities "in-house," while in other cases, the RPSP outsource some of the required services to other service providers.

41.     These RPSP deliver all the essential recordkeeping and related administrative ("RK&A") services through standard bundled offerings.

42.     There are two types of essential RK&A services provided by all RPSP.  For large plans with substantial bargaining power (like the Plan), the first type, "Bundled RK&A," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RK&A services include, but are not limited to, the following standard services:

    a.  Recordkeeping;
    b.  Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);
    c.  Administrative Services related to converting a plan from one RPSP to another RPSP;

d.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.  Maintenance of an employer stock fund (if needed);

f.  Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.  Plan consulting services including assistance in selecting the investments offered to participants;

h.  Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.  Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.  Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

43.     The second type of essential RK&A services, hereafter referred to as "Ad Hoc RK&A" services, provided by all RPSP, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).  The rationale is, for example, that one participant who does not take out a loan should not pay fees to cover the costs of other participants who choose to take a loan.  These "Ad Hoc RK&A" services typically include, but are not limited to, the following:

a.  Loan Processing;

b.  Brokerage services / account maintenance (if offered by the plan);

c.  Distribution services; and

d.  Processing of Qualified Domestic Relations Orders.

44.     For large plans with greater than 10,000 participants, any minor variations in the way that these two types of essential RK&A services, as well as any other RK&A services included in the bundled offering of RK&A services, are delivered has no material impact on the fees charged

11

by RPSP.  That fact is confirmed by the practice of all RPSP quoting fees for the Bundled RK&A services on a per participant basis without regard for any individual differences in services requested -- which are treated by the RPSP as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RK&A services.

45.      The combination of Bundled RK&A Services and Ad Hoc RK&A services can be referred to as retirement plan services ("RPS").  The vast majority of fees earned by RPSP through providing RPS typically come from the bundled fee for providing the Bundled RK&A services as opposed to the Ad Hoc RK&A services. The Plan had a standard package of RPS, i.e., Bundled RK&A Services and Ad Hoc RK&A services as described above

46.      RPSP offer the same bundles and combinations of services as their competitors.  As a result, the market for defined contribution retirement plan services has become increasingly price competitive, particularly for large plans that, like the Plan, have a sizable number of participants and a large amount of assets.

47.      Over the past twenty years, the fees that RPSP have been willing to accept for providing retirement plan services has significantly decreased.  RPSP are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

48.      By the start of and during the entire Class Period, the level of fees that RPSP have been willing to accept for providing RPS has stabilized, and has not materially changed for large plans, including the Plan.  In other words, reasonable RPS fees paid in 2018 are representative of the reasonable fees for RPS during the entire Class Period (meaning from 2015 to the present).

49.      The underlying cost to a RPSP of providing the RPS to a defined contribution plan

is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

50.     The incremental cost for a RPSP to provide RPS for a participant's account does not materially differ from one participant to another and is not dependent on the balance of the participant's account.

51.     RSPS for relatively larger defined contribution plans, like the Plan, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.

52.     Therefore, while the total cost to an RPSP to deliver RPS increases as more participants join the Plan, the cost per participant to deliver the RPS decreases.

53.     Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RPSP.

54.     Since at least the early 2000s, Defendants should have been aware of this cost structure dynamic for RPSP.

55.     Sponsors of defined contribution plans contract for RPS separately from any contracts related to the provision of investment management services to plan participants.

56.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of RPS performed by the RPSP on behalf of the investment manager.

57.     As a result, RPSP often make separate contractual arrangements with mutual fund providers. For example, RPSP often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual

fund. These fees are known as "revenue sharing."

58.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RPSP 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

59.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RPS. The difference between the total expense ratio and the revenue sharing is known as the "Net Investment Expense to Retirement Plans."

60.     In the context of defined contribution plans, when a Plan adopts prudent and best practices, the Net Investment Expense to Retirement Plans is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

61.     RPSP typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

62.     Regardless of the pricing structure that the plan fiduciary negotiates with any service provider, the amount of compensation paid to service providers, including the RPSP, must be reasonable.

63.     As a result, plan fiduciaries must understand the total dollar amounts paid to their service providers, including the RPSP, and be able to determine whether the compensation is reasonable by understanding what the market is for the RPS received by the Plan.

64.     Because RPS fees are actually paid in dollars and because of the cost dynamic, the fees paid for RPS are evaluated and compared on a dollar per participant basis.

65.     It is well known among retirement Plan consultants and advisors (who often act as

co-fiduciaries to the Plan Fiduciaries) that, all else being equal, a Plan with more participants can and will receive a lower effective per participant RPS fee when evaluated on a per participant basis.

66.     During the Class Period, Defendants knew and/or were aware that a Plan with more participants can and will receive a lower effective per participant RPS fee when evaluated on a per participant basis.

67.     During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant RPS fee when evaluated on a per participant basis.

## THE PLAN

66.     Started on January 1, 2010, the Plan now has over 16,000 participants and assets of approximately $4,000,000,000. More specifically, at the end of 2019, the Plan had approximately 16,792 participants and approximately $3,994,082,000 in assets.

67.     At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) Plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management. The fees were also excessive relative to the RPS services received. These excessive fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

68.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiffs and all other Plan Participants, by: (1) by failing to monitor the RPS fees paid by the Plan to ensure that they were reasonable and, as a result, authorizing the plan to pay objectively unreasonable and excessive RPS fees, relative to the RPS services received; and (2) by failing to adequately disclose fees associated with the Plan to Participants.

69.     Defendants' mismanagement of the Plan, to the detriment of Plaintiffs, Plan Participants, and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. §1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RPSP

70.     A Plan Fiduciary is required to fully understand all sources of revenue received by all service providers, including its RPSP. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the services provided.

71.     Prudent Plan Fiduciaries ensure they are paying only reasonable fees for RPS by soliciting competitive bids from other service providers to perform the same services currently being provided to the Plan. This is not a difficult or complex process and is performed regularly by prudent Plan Fiduciaries. Plan Fiduciaries need only request a bid from salespeople at other service providers. For Plans with as many participants as Defendants' Plan, some RPSP would require only the number of participants while others might require only the number of participants and the amount of the assets to provide a quote.

72.     Prudent Plan Fiduciaries have all of this information readily available and can easily receive a quote from other RPSP to determine if the current level of RPS fees is reasonable.

73.     Having received bids, the prudent Plan Fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee if necessary.

74.     Prudent plan Fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

75.     After the revenue requirement is negotiated, the plan Fiduciary determines how to pay the negotiated RPS fee. The employer/Plan Sponsor can pay the recordkeeping fee on behalf

of participants, which is the most beneficial to plan Participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable RPSP would accept. Usually, however, the employer decides to have the Plan (Plan Participants) pay the RPS fee instead. If the RPS fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated fee among participant accounts on a per capita or pro-rata basis.

76.    In other words, if the Plan negotiates a per participant revenue threshold of $30.00 for the Bundled RK&A, the Plan does not need to require that each participant pay $30.00. Rather, the Plan Fiduciary could determine that an asset-based fee is more appropriate for Plan Participants and allocate the Bundled RK&A fee pro rata to participants. For example, a 15,000 participant Plan with a $30.00 revenue threshold would pay $450,000 for RPS. If the Plan had $3,000,000,000 in assets, then the $450,000 would work out to 1.5 basis points. Accordingly, the Plan Fiduciary could allocate the $450,000 to Plan Participants by requiring that each participant pay 1.5 basis points.

77.    In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan. This structure creates situations in which the RPS do not change but, because of market appreciation and contributions to the Plan, the revenue received by the RPSP increases. This structure was historically preferred by RPSP because it allowed them to obtain an increase in revenue without having to ask the client to pay a higher fee.

78.    Regardless of the pricing structure, the Plan Fiduciary must ensure that the fees paid to service providers for RPS are reasonable.

79.    All of these standards were accepted and understood by prudent Plan Fiduciaries, including Defendants, at all times during the Class Period.

80.    For example, fiduciary best practices based on DOL guidelines, case law, and

marketplace experience are as follows:

> 1. Price administrative fees on a per-participant basis.
>
> 2. Benchmark and negotiate recordkeeping and investment fees separately.
>
> 3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
>
> 4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.
>
> . . . .
>
> 7. Review services annually to identify opportunities to reduce administrative costs.[1]

81.    Instead of using only one RPSP, Defendants cobbled together services from many providers, which often leads to a duplication of services and higher fees with no additional benefit to Plan Participants.

82.    Prudent fiduciaries implement three related processes to prudently manage and control a Plan's recordkeeping [RPS] costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) Plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution Plan Fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

83.    First, a Plan Fiduciary must pay close attention to the recordkeeping fees being paid by the Plan. A hypothetical prudent Fiduciary tracks the RPSP's expenses by demanding documents that summarize and contextualize the RPSP's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

---

[1] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013).

84.    Second, to make an informed evaluation as to whether a RPSP or other service provider is receiving no more than a reasonable fee for the services provided to a Plan, a prudent hypothetical Fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the Plan's RPSP. To the extent that a Plan's investments pay asset-based revenue sharing to the RPSP, prudent fiduciaries monitor the amount of the payments to ensure that the RPSP's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the Plan and its Participants.

85.    Third, a hypothetical plan Fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other Plans, as well as the RPS rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the Plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

86.    That said, by merely soliciting bids from other RPSP, a prudent Plan Fiduciary can quickly and easily gain an understanding of the current market for similar RPS services and have an idea of a starting point for negotiation.  Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

87.    Furthermore, a prudent fiduciary understands that paying reasonable RPS fees does *not* require changing RPSP. On the contrary, prudent plans continually monitor their current RPS fees.  If the fees charged by the incumbent RPSP are higher than the bids solicited from competitors than the prudent Plan Fiduciary negotiates with its current provider to ensure that the fees are

19

reasonable. In virtually all cases, the incumbent RPSP will reduce its fees to match the bids of the competitors.

88.     If, however, the incumbent RPSP unreasonably refuses to reduce the fees, then the prudent Plan Fiduciary moves to a new RPSP that can provide the materially the same level and quality of services at a reasonable fee.

89.     Switching to a new provider that charges a reasonable fee is not a difficult process and it indisputably benefits participants.  More than 30,000 plan fiduciaries switch RPSP every year.  All RPSP have dedicated teams to assist plan fiduciaries through the process.  There are no additional transition/conversion fees charged by the new provider for large plans such as the Plan.

90.     Finally, prudent plan fiduciaries recognize that any difficulty or inconvenience to the plan sponsor in the context of switching to a new RPSP is not an appropriate consideration for a plan fiduciary acting for the exclusive interest of plan participants.

### THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RPS FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RPS FEES

91.     A Plan Fiduciary must continuously monitor its RPS fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as RPSP) are reasonable.

92.     During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RPS fees paid to RPSP, including but not limited to its primary RPSP: Hewitt Associates, Alight Financial Solutions, and Fidelity.

93.     During the Class Period, Defendants failed to regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited to: Hewitt Associates, Hewitt Financial Services, Alight Financial Solutions, Fidelity, Northern Trust Corporation, Pershing LLC, Prism Design, Inc., Simply Connect Consulting, LLC, Revolution Productions LLC, and Printedge, among others.

94.     During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to its primary RPSP, to avoid paying objectively unreasonable fees for RPS services.

95.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to, its primary RPSP to avoid paying unreasonable fees for RPS services.

96.     During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

97.     During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

98.     During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not have a process in place to ensure that the Plan paid no more than a competitive reasonable fee for RPS. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RPS.

99.     During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

100.     During the Class Period and because Defendants failed to regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited to its primary RPSP, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in a prudent process.

101.     During the Class Period and because Defendants did not regularly solicit quotes

and/or competitive bids from covered service providers, including but not limited to its primary RPSP, before and/or when paying fees for RPS, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in these processes. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RPS.

102.   During the Class Period and because Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for RPS to covered service providers, including but not limited to its primary RPSP, the Plan's RPS service fees were significantly higher than they would have been had Defendants engaged in these efforts.

103.   Regardless of whether the RPS are provided by a few vendors or multiple vendors, Plan Fiduciaries are required to ensure that only reasonable fees are paid by the plan.  All else being equal, Plan Fiduciaries may not choose to provide the same bundle of services to their participants under a more expensive service provider arrangement or structure.

104.   The Plan's Participant Fee Notice (Section 404a-5 Notice) describes a standard bundle of RPS that could have easily been provided by several other quality RPSP. There is nothing contained in the Notice that describes any services that would warrant fees in excess of the fees that other RPSP would provide to the Plan for materially identical services.

105.   An analysis of the Plan's 5500 forms, however, reveals an inexplicable combination of duplicative service providers receiving excessive and unreasonable fees while Plan Participants did not receive any extra value to warrant the excessive and unreasonable fees.

106.   For example, the Chart below shows all the covered service providers receiving compensation from the Plan from 2015-2019 based on the Plan's 5500 filings.  The chart illustrates that the Plan paid over 26 million in Direct Compensation during that 5-year period.

**Schedule C - Direct Compensation**

| Provider | Relationship | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| ALIGHT FINANCIAL SOLUTIONS | RECORDKEEPER | $0 | $0 | $151,174 | $16,064 | $4,415 | $171,653 |
| AON HEWITT FINANCIAL ADVISORS, LLC | INVESTMENT ADV. | $2,453,188 | $2,424,109 | $2,069,345 | $0 | $0 | $6,946,642 |
| BDO USA, LLP | ACCOUNTANT | $0 | $0 | $0 | $78,000 | $78,000 | $156,000 |
| BLACKROCK INSTITUTIONAL TRUST CO,NA | INV. MANAGER | $1,525,782 | $1,399,494 | $1,916,009 | $889,007 | $1,137,338 | $6,867,630 |
| CURCIO WEBB | CONSULTING | $0 | $0 | $77,621 | $0 | $0 | $77,621 |
| DELOITTE & TOUCHE, LLC | ACCOUNTANT | $185,520 | $247,550 | $166,700 | $0 | $0 | $599,770 |
| FID INV INST OPS CO | RECORDKEEPER | $0 | $0 | $97,940 | $444,808 | $442,350 | $985,098 |
| HEWITT ASSOCIATES LLC | RECORDKEEPER | $1,406,164 | $1,205,098 | $510,776 | $0 | $0 | $3,122,038 |
| HEWITT ENNISKNUPP INC. | INVESTMENT ADV. | $49,875 | $57,500 | $60,000 | $0 | $0 | $167,375 |
| HEWITT FINANCIAL SERVICES LLC | BROKER | $238,321 | $211,936 | $78,402 | $60,000 | $73,494 | $662,153 |
| NORTHERN TRUST CORPORATION | TRUSTEE | $199,894 | $204,600 | $154,026 | $190,989 | $34,003 | $783,512 |
| PRINTEDGE | PRINTING | $22,148 | $39,255 | $77,527 | $6,588 | $18,634 | $164,152 |
| PRISM DESIGN, INC. | COMMUNICATIONS | $8,902 | $39,607 | $0 | $0 | $0 | $48,509 |
| REVOLUTION PRODUCTIONS LLC | COMMUNICATIONS | $0 | $10,450 | $0 | $0 | $0 | $10,450 |
| SIMPLY CONNECT CONSULTING LLC | COMMUNICATIONS | $0 | $15,175 | $71,448 | $25,473 | $17,799 | $129,895 |
| STRATEGIC ADVISORS | INV. ADVISORY | $0 | $0 | $621,705 | $2,287,504 | $2,241,108 | $5,150,317 |
| **Total Schedule C** | | $6,089,794 | $5,854,774 | $6,052,673 | $3,998,433 | $4,047,141 | $26,042,815 |

107.    An evaluation and analysis of the 2018 5500 filings of plans with similar numbers of participants enables a determination of a reasonable fee that could have been obtained by a prudent plan fiduciary for a materially similar bundle of services from other quality RPSP.

108.    To ensure that it is reasonable to draw inferences that the Plan Fiduciaries were imprudent, a conservative methodology was employed in evaluating the RPS fees paid by the Plan whereas the methodology used for comparable plans would tend to overstate their fees in relation to the fees paid by the Plan.

109.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RPS fees illustrating that the Plan had on average 17,377 participants and paid an average effective annual RPS fee of at least approximately $1,360,044, which equates to an average of at least approximately $78 per participant. These are the minimum amounts that could have been paid.

## Retirement Plan Services  (RPS) Fees

| | 2015 | 2016 | 2017 | 2018 | 2019 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 17,886 | 17,922 | 17,345 | 16,940 | 16,792 | ***17,377*** |
| **Est. RPS Fees** | $2,008,806 | $1,843,669 | $1,253,085 | $974,485 | $720,175 | ***$1,360,044*** |

| Est. RPS Per Participant | $112 | $103 | $72 | $58 | $43 | *$78* |
|---|---|---|---|---|---|---|

110.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RPS fees paid by other comparable Plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RPS Fees paid by the Plan (as identified in the table above).

## Kimberly-Clark Plan Average RPS Fee Comparison 2015-2019

### Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500[1]

| Plan | Participants | Assets | RPS Fees | RPS Fees /pp | Recordkeeper | Graph Color |
|------|-------------|--------|----------|--------------|--------------|-------------|
| Children'S Medical Center Of Dallas Employee Savings Plan 403(B) Component | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Flowers Foods, Inc. 401(k) Retirement Savings Plan | 10,789 | $607,338,501 | $532,282 | $49 | Great-West | White |
| Multicare Health System 403(B) Employee Savings Plan | 11,437 | $559,801,095 | $557,439 | $49 | Transamerica | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| **Kimberly-Clark Plan Average Fee** | **17,377** | **$3,611,991,200** | **$1,360,044** | **$78** | **Alight / Fidelity** | **Red** |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Jbs 401(K) Savings Plan | 19,420 | $374,330,167 | $363,409 | $19 | Great-West | White |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |

[1]Price calculations are based on 2018 Form 5500 information.

111.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RPS fees paid by other comparable Plans of similar

sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RPS Fees paid by the Plan (as identified in the table above), with the white data points representing RPS fees that RPS providers offered to (and were accepted by) comparable Plans.



112.    From the years 2015 to 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual RPS fee of at least $78 per participant for RPS services.

113.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan Fiduciary would have paid on average an effective annual RPS fee of around $30 per participant, if not lower.

114.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management, with similar level and quality of services, had Defendants been acting in the exclusive best interest of the Plan's Participants, the Plan actually would have paid significantly less than an average of approximately $1,360,044 per year in RPS fees, which equated to an effective average of approximately $78 per participant per year.

115.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management, with similar level and quality of services, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for RPS services of approximately $521,310, per year in RPS fees, which equates to approximately $30 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay more than double what they could otherwise pay for RPS services.

116.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $838,734 per year in RPS fees, which equates to on average approximately $48 per participant per year.

117.    From the years 2015 to 2019, and because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management, the Plan actually cost its Participants a total minimum

amount of approximately $4,193,670 in unreasonable and excessive RPS fees.

118.    From the years 2015 to 2019 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $6,273,391 in RPS fees.

119.    During the entirety of the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RPS fees it paid to their primary RPSP (Hewitt Associates, Alight Financial Solutions, and Fidelity).

120.    During the entirety of the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to their RPSP vis-à-vis the fees that other RPSP would charge for the same level and quality of services.

121.    During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RPS fees it paid to its RPSP, but Defendants simply failed to do so.

122.    During the entirety of the Class Period and had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to their RPSP, it would have realized and understood that the Plan was compensating its RPSP unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Plan Participants. The fees were also excessive relative to the RPS services received, which were essentially across all RPSP.

123.   The RSP fees charged to the Plan by its primary RPSP were excessive relative to the level and quality of the RPS received by the Plan. Other RPSP would have, and did, accept lower fees for the exact same bundle of retirement plan services at the same level and quality of services.

124.   The Plan's fees were therefore not justified by the services provided when considering the "plan as a whole," *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011), and there were "hypothetical lower-cost covered service provider[s that] would have performed at the level necessary to serve the best interests of the" Plan's Participants. *Divane v. Northwestern Univ.,* 953 F.3d 980, 991 (7th Cir. 2020).

125.   During the entirety of the Class Period and by failing to recognize that the Plan and its Participants were being charged much higher RPS fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiffs and the Plan Participants.

## CLASS ACTION ALLEGATIONS

126.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

127.   In acting in this representative capacity, Plaintiffs seek to certify this action as a Class Action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> *All participants and beneficiaries of the Kimberly-Clark Corporation 401(k) and Profit Sharing Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning six years before the commencement of this action and running through the date of judgment.*

128.     The Class includes more than 16,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

129.     There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

130.     Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

131.     Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

132.     Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual

30

participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

133.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

134.    Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

135.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

136.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

137.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's

decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
### Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
### (Plaintiffs, on behalf of themselves and Class, against All Defendants – RPS Fees)

138.    Plaintiffs restate the above allegations as if fully set forth herein.

139.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

140.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

141.    Defendants, as fiduciaries of the Plan, are responsible for selecting a single RPSP or a group of service providers that charge reasonable RPS fees.

142.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RPS fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

143.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiffs, by failing to: ensure that the Plan's RPS fees were reasonable, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

144.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's RPSP to make sure they were providing the contracted services at

reasonable costs, given the highly competitive market surrounding retirement plan services and the significant bargaining power the Plan had to negotiate the best fees.

145.    During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiffs, by failing to employ a prudent and loyal process and by failing to critically or objectively evaluate the cost and performance of the Plan's RPSP in comparison to other options.

146.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A).

147.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

148.    As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiffs and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

149.    Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, against Kimberly-Clark and Board**
**Defendants – RPS Fees)**

150.    Plaintiffs restate the above allegations as if fully set forth herein.

151.   Defendants had the authority to appoint and remove members or individuals responsible for Plan RPS fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

152.   In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RPS fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

153.   Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

154.   The excessive retirement plan service fees paid by the Plan inferentially suggest that Kimberly-Clark and the Board breach their duty to monitor the individuals they appointed to the Benefit Administration Committee, by, among other things:

a.     Failing to monitor and evaluate the performance of individuals responsible for Plan RPS fees or have a system in place for doing so, and standing idly by as the Plan suffered significant losses in the form of unreasonably high RPS expenses;

b.     Failing to monitor the process by which Plan RPSP were evaluated and failing to investigate the availability of lower-cost RPSP; and

c.     Failing to remove individuals responsible for Plan RPS fees whose performance was inadequate in that these individuals continued to pay the same RPS costs even though benchmarking and using other similar comparators would have showed that maintaining the Plan's

34

primary RPSP was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

155.    As the consequences of the foregoing breaches of the duty to monitor for RPS fees the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

156.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RPS fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## **<u>CONCLUSION</u>**

Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent selection of RPSP, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring Defendant Kimberly-Clark to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Kimberly-Clark as necessary to effectuate relief, and to prevent Kimberly-Clark's unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated: April 15, 2021                              Respectfully submitted,

*/s/ Joe Kendall*
JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Fax: (214) 744-3015
E-Mail: jkendall@kendalllawgroup.com

James A. Walcheske*
Scott S. Luzi*
Paul M. Secunda*
*Pro Hac Motions Pending*
**WALCHESKE & LUZI, LLC**
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

**Counsel for Plaintiffs**