IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHRISTINA C. SEIDNER, JARED MACKRORY, individually and as representatives of a Class of Participants and Beneficiaries of the Kimberly-Clark Corporation 401(k) and Profit Sharing Plan, | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 3:21-CV-00867-L |
| KIMBERLY-CLARK CORPORATION, | CLASS ACTION AMENDED COMPLAINT FOR CLAIMS UNDER 29 U.S.C. § 1132(A)(2) |
| and | |
| BENEFITS ADMINISTRATION COMMITTEE OF KIMBERLY-CLARK CORPORATION | |
| Defendants | |

## AMENDED COMPLAINT

COMES NOW Plaintiffs, Christina C. Seidner and Jared Mackrory, individually and as representatives of a Class of Participants and Beneficiaries on behalf of the Kimberly Clark Corporation 401(k) and Profit Sharing Plan (the "Plan" or "Kimberly Clark Plan"), by their counsel, WALCHESKE & LUZI, LLC and KENDALL LAW GROUP, PLLC, and for a claim against Defendants, alleges and asserts to the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.    Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.    The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190, 194 (5th Cir. 2020.)

3.    The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.    Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.       Defendants, Kimberly-Clark Corporation ("Kimberly-Clark") and the Benefits Administration Committee of the Kimberly Clark Corporation ("Committee") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the Kimberly-Clark Corporation 401(k) and Profit Sharing Plan (the "Plan" or "Kimberly-Clark Plan") – that it sponsors and provides to its employees.

6.       During the putative Class Period (April 15, 2015 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping," *Hughes*,142 S. Ct. at 739-740, and by failing to properly monitor their high-cost recordkeepers, Fidelity Investments Institutional Operations Company ("Fidelity"), Hewitt Associates ("Hewitt"), and Alight Financial Solutions ("Alight"), and removing them when their recordkeeping fees became imprudent.

7.       A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

8.       Defendants failed to regularly monitor the Plan's recordkeeping fees paid to its recordkeepers, Fidelity, Hewitt, and Alight.

9.       Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Fidelity, Hewitt, and Alight, in order to avoid paying unreasonable recordkeeping fees.

10.    Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable recordkeeping fees it paid to Fidelity, Hewitt, and Alight, and in light of the level and quality of recordkeeper services it received.

11.    From the years 2015 through 2019, the graph below illustrates the annual recordkeeping fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual recordkeeping ("RPS") fees paid by the Plan.



12.    This graph illustrates that Defendants' breach of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable recordkeeping fees.

13.     These objectively unreasonable recordkeeping fees cannot be contextually jus-
tified and do not fall within "the range of reasonable judgments a fiduciary may make based
on her experience and expertise," *See Hughes*, 142 S. Ct. at 742, because these recordkeep-
ing allegations are not about "reasonable tradeoffs" between recordkeepers providing a dif-
ferent level or quality of services.

14.     There is no requirement to allege the actual inappropriate fiduciary actions
taken.  Even when the alleged facts do not "directly address[ ] the process by which the Plan
was managed," a claim alleging a breach of fiduciary duty is made out if the court, based on
circumstantial factual allegations, reasonably "infer[s] from what is alleged that the process
was flawed." *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017.)

15.     The unreasonable recordkeeping fees paid, as well as the unreasonable selec-
tion and retention of Fidelity, Hewitt, and Alight, as recordkeepers, inferentially tells the
plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

16.     To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the
Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a),
to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction in this ERISA matter under 28
U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction
of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

18.     This Court has personal jurisdiction over Defendants because they transact
business in this District, reside in this District, and have significant contacts with this Dis-
trict, and because ERISA provides for nationwide service of process.

19.      Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

20.      In conformity with 29 U.S.C. §1132(h), Plaintiffs served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

21.      Plaintiff, Christina Seidner, is a resident of the State of Wisconsin, and currently resides in Appleton, Wisconsin, and during the Class Period is a Participant in the Plan under 29 U.S.C. § 1002(7.)

22.      Plaintiff Seidner worked as a Senior Brand Manager. She was hired April 9, 2013, and worked at the Kimberly-Clark facility in Neenah, Wisconsin.

23.      Plaintiff Seidner's employment with Kimberly-Clark ended on March 30, 2021.

24.      Plaintiff Seidner, during the Class Period, invested in the following Plan "core funds": International Index, Small Cap Index, Large Cap Growth Stock Index, Large Cap Growth Index, Large Cap Value Stock Index, and Bond Index.  All of these core funds were subjected to revenue sharing to pay for Plan recordkeeping fees, as "amounts held in the core funds are reduced by an estimated 0.1% annually," according to the January 2021 Summary Plan Description ("SPD") for the Plan.

25.      Plaintiff, Jared Mackrory, is a resident of the State of Colorado, and currently resides in Broomfield, Colorado, and during the Class Period is a Participant in the Plan under 29 U.S.C. § 1002(7.)

26.      Plaintiff Mackrory worked as a Director of Shopping Marketing.  He was hired July 12, 2010, and worked at the Kimberly-Clark facility in Neenah, Wisconsin.

27.     Plaintiff Mackrory's employment with Kimberly-Clark ended on June 19, 2019.

28.     Plaintiff Mackrory, during the Class Period, invested in the following Plan "core fund": Large Cap Growth Stock Index.  This core fund was subjected to revenue sharing to pay for Plan recordkeeping fees, as "amounts held in the core funds are reduced by an estimated 0.1% annually," according to the January 2021 SPD for the Plan.

29.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their own Plan accounts through paying excessive recordkeeping fees to Fidelity, Hewitt, and Alight during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Fidelity, Hewitt, and Alight as its recordkeepers, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiffs and Class.

30.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

31.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

32.     Kimberly-Clark Corporation sells products, including Adult Care, Baby and Child Care, FamilyCare, and Feminine Care products. Brands include Depend, Huggies,

Kleenex, Cottonelle, Scott, and Kotex. Its principal headquarters located at 351 Phelps Drive, Irving, TX 75038-6507. In this Complaint, "Kimberly-Clark" refers to the named Defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

33.     Kimberly-Clark acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Kimberly-Clark appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Kimberly-Clark is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

34.     The Benefits Administration Committee of the Kimberly Clark Corporation ("Committee Defendants") is the Plan Administrator of the Kimberly-Clark Corporation 401(k) and Profit Sharing Plan and located at P.O. Box 59051, Knoxville, TN 37950-9051.

35.     As the Plan Administrator, Defendant Committee is also a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Defendant Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). Defendant Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

36.     To the extent that there are additional officers and employees of Defendants who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of

whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.

37.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Kimberly-Clark's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

38.     The Plan currently has about $4,000,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against Plan participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor recordkeeping fees to ensure Fidelity, Hewitt, and Alight, were prudent choices.

39.     With 16,792 participants in the year 2019, the Plan had more participants than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $3,994,082,000 in assets in the year 2019, the Plan had more assets than 99.96% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

40.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under

a plan. An employer may also make matching contribution based on an employee's elective deferrals.

41.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

42.     Although Kimberly-Clark contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees.

43.     Fees and expenses paid by the plan substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income. .

44.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

Recordkeeping Services

45.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Fidelity, Hewitt, and Alight are such recordkeepers.

46.      These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the same level and quality.

47.      There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RKA services include, but are not limited to, the following standard services:

 a. Recordkeeping;

 b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

 c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

 d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

 e. Maintenance of an employer stock fund (if needed);

 f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

 g. Plan consulting services including assistance in selecting the investments offered to participants;

 h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

 i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

 j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

48.     The second type of essential RKA services, "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

49.     These "Ad Hoc RKA" services typically include, but are not limited to, the following:

      a.    Loan processing;
      b.    Brokerage services/account maintenance;
      c.    Distribution services; and
      d.    Processing of Qualified Domestic Relations Orders (QDROs).

50.     For mega plans, like the Kimberly-Clark Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

51.     All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

52.     The vast majority of fees earned by recordkeepers typically come from Bundled RKA services as opposed to the Ad Hoc RKA services.

53.     Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

54.     Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by

recordkeepers, as such Bundled RKA fee rates represent meaningful benchmarks for purposes of comparison.

55.     Plan fiduciaries request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate.

56.     While there may be minor differences in the way the Bundled RKA services are delivered, those differences are not deemed material to the price comparisons.

57.     If a specific recordkeeper provided additional services that were not offered by the other recordkeepers, and those additional services were deemed material, then the plan fiduciaries would make a downward adjustment to the price proposed by that specific recordkeeper in the amount of the value added by the additional service to make an apples-to-apples comparison with the other recordkeeping offerings.

58.     The Kimberly-Clark Plan had a standard package of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also service mega plans.

59.     There is nothing in the service and compensation codes disclosed by the Plan fiduciaries in their Form 5500 filings during the Class Period (Codes 15, 37, 50, 60, 64, 65, 71), nor anything disclosed in the Participant section 404(a)(5) fee, Summary Plan Description, or service disclosure documents, that suggests the "recordkeeping fee" charged to Plan participants of "an estimated 0.1% annually" included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

60.     Accordingly, the disparity between the Plan's recordkeeping fees and the fee paid by meaningful benchmarks, several other similarly sized plans for the same standard

bundle of RKA services, cannot be explained by any additional services, or the quality or level of those services provided by Fidelity, Hewitt, and Alight to the Plan.

61.     Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

62.     Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

63.     By the start of, and during the entire Class Period, the level of fees that record-keepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Grifols Plan. In other words, reasonable recordkeep-ing fees paid in 2018 are representative of the reasonable fees during the entire Class Pe-riod.

64.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.  As a plan gains more participants, the rea-sonable market rate for the services provided by the recordkeeper will decline.

65.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeep-ers on behalf of the investment manager.

66.     As a result, recordkeepers often make separate contractual arrangements with mutual fund providers. Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

67.     Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.  Defendants utilized a combination of both direct payments and revenue sharing to pay for Plan recordkeeping fees during the Class Period.

68.     Defendants did not breach their fiduciary duty of prudence by merely allowing the Plan to pay some portion of recordkeeping fees through a revenue-sharing fee model. Indeed, regardless of the pricing structure that the plan fiduciary negotiates with recordkeepers, of which Plaintiffs express no preference, the amount of compensation paid to recordkeepers must be *reasonable* (not the "cheapest" or "average".)

69.     As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper, whether their direct compensation or revenue sharing, and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

## THE PLAN

70.     During the entire Class Period, the Plan received recordkeeping services from Fidelity, Hewitt, and Alight.

71.     At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

72.     The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the Kimberly-Clark Plan, regardless of the number of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

73.     It is clear, based on the 5500 forms and 404(a)(5) participant disclosures that Fidelity, Hewitt, and Alight, did not provide any services at any higher level that were not also part of the standard package of RKA services provided by all recordkeepers to mega plans.

74.     These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

75.     During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiffs, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

76.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiffs and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RECORDKEEPERS

77.     A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

78.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

79.     Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees.

80.     Switching to a new provider that charges a reasonable fee is not a difficult process and it indisputably benefits participants. More than 30,000 plan fiduciaries switch recordkeepers every year. All recordkeepers have dedicated teams to assist plan fiduciaries through the process. There are no additional transition/conversion fees charged by the new provider for large plans such as the Kimberly-Clark Plan.

81.     Prudent plan fiduciaries recognize that any difficulty or inconvenience to the plan sponsor in the context of switching to a new recordkeeper is not an appropriate consideration for a plan fiduciary acting for the exclusive interest of plan participants.

82.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

83.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" record-keeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

84.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014.)

85.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

86.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct com-pensation and revenue sharing being paid to the plan's recordkeeper.

87.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the record-keeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

88.     Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

89.     A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

90.     During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to Fidelity, Hewitt, and Alight.

91.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Fidelity, Hewitt, and Alight, in order to avoid paying unreasonable recordkeeping fees.

92.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable recordkeeping fees it paid to Fidelity, Hewitt, and Alight, and in light of the level and quality of recordkeeper services it received.

93.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual recordkeeping fees illustrating that the Plan had on average 17,377 participants and paid an average effective annual recordkeeping fee of at least approximately $1,360,044, which

equates to an average of at least approximately $78 per participant. These are the minimum amounts that could have been paid.

### Recordkeeping and Administration (RPS) Fees

|  | 2015 | 2016 | 2017 | 2018 | 2019 | *Average* |
|---|---|---|---|---|---|---|
| Participants | 17,886 | 17,922 | 17,345 | 16,940 | 16,792 | *17,377* |
| Est. RPS Fees | $2,008,806 | $1,843,669 | $1,253,085 | $974,485 | $720,175 | *$1,360,044* |
| Est. RPS Per Participant | $112 | $103 | $72 | $58 | $43 | *$78* |

94.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual recordkeeping fees paid by other comparable Plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual recordkeeping fees paid by the Plan (as identified in the table above).

**Kimberly-Clark Plan Average RPS Fee Comparison 2015-2019**

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RPS Fees | RPS Fees /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Children'S Medical Center Of Dallas Employee Savings Plan 403(B) Component | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Flowers Foods, Inc. 401(k) Retirement Savings Plan | 10,789 | $607,338,501 | $532,282 | $49 | Great-West | White |
| Multicare Health System 403(B) Employee Savings Plan | 11,437 | $559,801,095 | $557,439 | $49 | Transamerica | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| **Kimberly-Clark Plan Average Fee** | **17,377** | **$3,611,991,200** | **$1,360,044** | **$78** | **Alight / Fidelity** | **Red** |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Jbs 401(K) Savings Plan | 19,420 | $374,330,167 | $363,409 | $19 | Great-West | White |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |

[1]Price calculations are based on 2018 Form 5500 information.

95.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual recordkeeping fees paid by other comparable Plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual recordkeeping fees paid by the Plan (as identified in the table above), with the white data points representing recordkeeping fees that recordkeepers offered to (and were accepted by) comparable plans.



96.     From the years 2015 to 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual recordkeeping fee of at least $78 per participant for recordkeeping services.

97.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $30 per participant, if not lower.

98.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of

money under management, with similar level and quality of services, had Defendants been acting in the exclusive best interest of the Plan's participants, the Plan actually would have paid significantly less than an average of approximately $1,360,044 per year in recordkeeping fees, which equated to an effective average of approximately $78 per participant per year.

99.     From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, with similar level and quality of services, had Defendants been acting in the best interests of the Plan's participants, the Plan actually would have paid on average a reasonable effective annual market rate for RKA services of approximately $521,310, per year in recordkeeping fees, which equates to approximately $30 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay more than double what they could otherwise pay for RKA services.

100.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $838,734 per year in RKA fees, which equates to on average approximately $48 per participant per year.

101.    From the years 2015 to 2019, and because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, the Plan actually cost its participants a

total minimum amount of approximately $4,193,670 in unreasonable and excessive RKA fees.

102.     From the years 2015 to 2019 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $6,273,391 in RPS fees.

103.     Defendants could have offered the exact same recordkeeping services, at the same level and quality, at a lower cost by using a different recordkeeper, but did not do so.

104.     Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these recordkeeping allegations are not about reasonable tradeoffs between recordkeepers providing a different level or quality of services.

105.     Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeeper, and Defendants could have obtained the same recordkeeping services for less from other, similar recordkeepers.

106.     The higher cost recordkeeping services selected by Defendants were substantially identical to lower-cost recordkeeping services available in the market as highlighted by the chart above.

107.     Plaintiffs paid these excessive recordkeeping fees in the form of direct compensation to the Plan and suffered injuries to their Plan accounts as a result.

108.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RKA fees it paid to Fidelity, Hewitt, and Alight.

109.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Fidelity, Hewitt, and Alight, as compared to fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

110.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RKA fees it paid to Fidelity, Hewitt, and Alight, but Defendants either simply failed to do so, or did so ineffectively given that it paid almost double for RKA fees than it should have.

111.     During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Fidelity, Hewitt, and Alight, it would have realized and understood that the Plan was compensating Fidelity, Hewitt, and Alight, unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan participants and would have removed Fidelity, Hewitt, and Alight, as imprudent choices.

112.     The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. In other words, any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each record-keeper provides.

113.     During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RKA fees than they should have been and/or by failing to take effective remedial actions including removing Fidelity, Hewitt, and Alight, as Plan recordkeepers, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants, costing them millions of dollars in lost retirement monies.

## CLASS ACTION ALLEGATIONS

114.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

115.     In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Kimberly-Clark Corporation 401(k) and Profit Sharing Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning six years before the commencement of this action and running through the date of judgment.

116.     The Class includes over 16,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

117.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan;

c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

118.    Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

119.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

120.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these

breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

121.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

122.    Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

123.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

124.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

125.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

126.     Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs on behalf of themselves and Class against Defendant Committee)**

127.     Plaintiffs restate the above allegations as if fully set forth herein.

128.     Defendant Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

129.     29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Committee in its administration of the Plan.

130.     Defendant Committee, as a fiduciary of the Plan, is responsible for selecting a recordkeeper that charges objectively reasonable recordkeeping fees.

131.     During the Class Period, Defendant Committee had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

132.     During the Class Period, Defendant Committee breached its fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's

recordkeeping fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

133.     During the Class Period, Defendant Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

134.     During the Class Period, Defendant Committee breached its duty to Plan participants, including Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

135.     Through these actions and omissions, Defendant Committee breached its fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

136.     Defendant Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

137.     As a result of Defendant Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

138.     Defendant Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Kimberly-Clark Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Committee is subject to other equitable relief as set forth in the Prayer for Relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### (Plaintiffs on behalf of themselves and Class Against Defendant Kimberly-Clark)

139.     Plaintiffs restate the above allegations as if fully set forth herein.

140.     Defendant Kimberly-Clark had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees on Defendant Committee, and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

141.     In light of this authority, Defendant Kimberly-Clark had a duty to monitor those individuals responsible for Plan recordkeeping fees on Defendant Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

142.     Defendant Kimberly-Clark had a duty to ensure that the individuals responsible for Plan administration on Defendant Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate

records of the information on which they based their decisions and analysis with respect to

the Plan's investments; and reported regularly to Defendant Kimberly-Clark.

143.     The objectively unreasonable and excessive recordkeeping fees paid by the

Plan inferentially suggest that Defendant Kimberly-Clark breached their duty to monitor

by, among other things:

a.     Failing to monitor and evaluate the performance of individuals respon-
sible for Plan recordkeeping fees on Defendant Committee or have a sys-
tem in place for doing so, standing idly by as the Plan suffered signifi-
cant losses in the form of objectively unreasonably recordkeeping ex-
penses;

b.     Failing to monitor the process by which the Plan's recordkeeper was
evaluated and failing to investigate the availability of more reasonably-
priced recordkeepers; and

c.     Failing to remove individuals responsible for Plan recordkeeping fees on
Defendant Committee whose performance was inadequate in that these
individuals continued to pay the same recordkeeping costs even though
solicitation of competitive bids would have shown that maintaining Fi-
delity, Hewitt, and Alight, as recordkeepers at the contracted price was
imprudent, excessively costly, all to the detriment of the Plan and Plan
participants' retirement savings.

144.     As the consequences of the foregoing breaches of the duty to monitor for record-

keeping fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively

unreasonable and unnecessary monetary losses.

145.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant Kimberly-Clark is

liable to restore to the Kimberly-Clark Plan all loses caused by their failure to adequately

monitor individuals responsible for Plan recordkeeping fees on Defendant Committee. In

addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth

in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable record-keeping fees, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.   An Order requiring Kimberly-Clark to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Kimberly-Clark as necessary to effectuate relief, and to prevent Kimberly-Clark's unjust enrichment;

F.   An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.   An award of pre-judgment interest;

I.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.   Such other and further relief as the Court deems equitable and just.

Dated this 21st day of April, 2022

s/ *Paul M. Secunda*

JAMES A. WALCHESKE
SCOTT S. LUZI
*PAUL M. SECUNDA
*admitted pro hac vice
WALCHESKE & LUZI, LLC
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

JOE KENDALL
Texas Bar No. 11260700
KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Fax: (214) 744-3015
E-Mail: jkendall@kendalllawgroup.com

Counsel for Plaintiffs